[Civ. No. 22766. Second Dist., Div. Two. Aug. 1, 1958.]

EDMUND G. BROWN, as Attorney General, Plaintiff and Respondent, v. MEMORIAL NATIONAL HOME FOUNDATION (a Nonprofit Corporation) et al., Appellants; AMERICAN GOLD STAR MOTHERS, INC. (a Nonprofit Corporation), Defendant and Respondent.

[Civ. No. 22871. Second Dist., Div. Two. Aug. 1, 1958.]

EDMUND G. BROWN, as Attorney General, Plaintiff and Respondent, v. MEMORIAL NATIONAL HOME FOUNDATION (a Nonprofit Corporation), Appellant; AMERICAN GOLD STAR MOTHERS, INC. (a Nonprofit Corporation), Defendant and Respondent; R. E. ALLEN et al., Receivers, and Respondents.

516

Trent G. Anderson, Jr., Wright, Wright, Goldwater & Wright, Loyd Wright, Richard M. Goldwater, Dudley K. Wright and George W. Trammell for Appellants.

Edmund G. Brown, Attorney General, and George M. Goffin, Deputy Attorney General, for Plaintiff and Respondent.

Wise, Kilpatrick & Pulley, George E. Wise and Robert J. Kilpatrick for Defendant and Respondent.

Loeb & Loeb and Herman F. Selvin for Receivers and Respondents.

ASHBURN, J.—Two appeals in the same case are presented together. One of them (No. 22766) is taken from a judgment removing Memorial National Home Foundation (hereinafter designated as Foundation) as trustee of a charitable trust and granting other relief; the other (No. 22871) attacks an order fixing compensation of receivers, etc.

### APPEAL FROM JUDGMENT

Basically the litigation is a struggle between Foundation and American Gold Star Mothers, Inc. (herein referred to as Gold Star) for control of the assets of charitable trusts created for the benefit of Gold Star mothers. The attorney general instituted an action against both of these corporations seeking declaratory relief as to their conflicting claims; Gold Star filed a cross-complaint. The assets were in the name and under the control of Foundation. The court held it had abused and abandoned its trusts, should be removed as trustee and a new trustee should be appointed; it also appointed receivers to manage the property pending the selection of a successor trustee, the taking of an accounting from Foundation, etc. Though designated as interlocutory, this court held the judgment to be final for purposes of appeal (*Brown* v. *Memorial Nat. etc. Foundation*, 158 Cal.App.2d 448 [322 P.2d 600]).

Gold Star's ultimate position is that Foundation is its subsidiary and agent which acquired title to property intended for use in furtherance of Gold Star trusts and then repudiated those trusts, declared its independence of Gold Star and dedicated the property to partially different uses and to the exclusion of Gold Star management. Foundation and appellant Eleanor D. Boyd come to rest upon the proposition that Foundation has been at all times a distinct entity which never was a subsidiary of Gold Star, that its trusts are defined by its charter, which basic instrument it has amended to change the scope of the trusts as it had a lawful right to do.

The appellants (Foundation and Eleanor D. Boyd, cross-defendant) argue first that the evidence is insufficient to sustain the court's findings and conclusions as to the trusts assumed by Foundation and the class of beneficiaries to be benefited thereby. This raises the important question in the case. Did Foundation, under the dominating influence of Mrs. Boyd, acquire property and money dedicated to the relief of members of Gold Star and attempt to divert it to uses which defeat, at least partially, the trust for the benefit of members of Gold Star? The initial assets belonged to Gold Star; those and subsequent acquisitions were turned over to Foundation, held in its name, administered and claimed by it, and the claims of Gold Star with respect thereto were denied and ignored by Foundation. The story is long, but the result seems clear—that Foundation did acquire properties (cash and other donations and grants) to be held in trust for members of Gold Star, and having done so diverted them to uses divergent from and partially destructive of those of Gold Star, and also excluded Gold Star from any voice in administration of the trust.

Gold Star, which has its headquarters in Washington, D.C., was formed as a corporation for charitable and patriotic purposes under the laws of the District of Columbia, in January, 1929, under the name of American Gold Star Mothers. Its purposes were stated as follows: ''[T]o unite with loyalty, sympathy, benevolence, charity, and love for each other, mothers whose sons or daughters have made the supreme sacrifice while in any branch of the Military or Naval Service of the United States of America, or who have died as a result of such service, . . .'' By amendment of 1937 the objects were restated to contain the following definition of purposes: ''To extend needful assistance to all Gold Star Mothers and when possible, to their descendants. . . . This is an association of Mothers whose sons and daughters served and died in the Allied Cause in the Great World War, or died as a result of such service.'' In November, 1950, the name was changed to ''American Gold Star Mothers, Inc.'' and the objects again amended to add a definition of the word ''mothers'' as used in the original and amended articles, viz., ''mothers whose sons or daughters have made the supreme sacrifice while in any branch of the Armed Services of the United States of America or have died as result of such service and are designated as 'Gold Star Mothers' by the laws of the Congress of the United States and/or the Rules and Regulations issued

by the Department of National Defense or any branch thereof''; the amendment retained the following expressed purpose: ''. . . to extend needful assistance to all Gold Star Mothers and when possible to their descendants.''

In 1950 Mrs. Boyd, then president of Gold Star, described the organization as the one ''that has been known for more than twenty years as the National Organization for Gold Star Mothers.'' At the time of trial in July, 1956, it had more than 500 chapters and over 20,000 members in good standing. Membership dues are three dollars a year and fathers of persons dying as a result of war injuries become associate members without vote and without dues.

Mrs. Boyd was elected president of Gold Star in June, 1946, and continued to be such until June, 1952, with the exception of the period from June, 1947, to June, 1948. Prior to the convention of June, 1947, she had conceived or adopted the idea of establishing a home for needy members of Gold Star. At that meeting she presented the matter as a ''No. 1 objective of the organization,'' saying in part: ''I feel we should keep faith with our sons and daughters by forming a Foundation within our present organization for a National Memorial Home for these forgotten mothers. This can be done under the direction of the American Gold Star Mothers, Inc., which is a non-profit organization. . . .'' A resolution fostered by her was adopted, reading as follows: ''RESOLVED that President Eleanor D. Boyd be, and she is hereby authorized and directed to proceed with the formation and establishment of a national home for needy members of Gold Star mothers, which home shall at all times be under the auspices of the American Gold Star Mothers, Inc.

''RESOLVED, further, that the president, Eleanor D. Boyd, be and she is hereby directed to make a full report as soon as possible showing the action which she has taken with respect to the formation of the Memorial National Home.'' Articles of Incorporation for such a project had been previously drafted and were filed in July, 1947. They created a charitable nonprofit corporation under the laws of California. ''[T]he primary purpose of its Articles of Incorporation was to benefit members of American Gold Star Mothers, Inc.'' according to appellants' opening brief.

■ Where a corporation becomes trustee of a benevolent trust the courts look first to its charter to determine the nature and extent of the dedication of its assets to eleemosynary purposes. ■ *Pacific Home* v. *County of Los Angeles*, 41

Cal.2d 844, 852 [264 P.2d 539] : ''Similarly, all the assets of a corporation organized solely for charitable purposes must be deemed to be impressed with a charitable trust by virtue of the express declaration of the corporation's purposes, and notwithstanding the absence of any express declaration by those who contribute such assets as to the purpose for which the contributions are made. In other words, the acceptance of such assets under these circumstances establishes a charitable trust for the declared corporate purposes as effectively as though the assets had been accepted from a donor who had expressly provided in the instrument evidencing the gift that it was to be held in trust solely for such charitable purposes. It follows that neither plaintiff nor its successor could legally divert its assets to any purpose other than charitable purposes. . . .'' ■ *In re Los Angeles County Pioneer Society,* 40 Cal.2d 852, 860 [257 P.2d 1] : '' '[A] devise to a society organized for a charitable purpose without a declaration of the use to which the gift is to be put is given in trust to carry out the objects for which the organization was created.' ''

■ The original articles of Foundation adopt the name ''American Gold Star Mothers, Incorporated, Memorial National Home Foundation.'' Its purposes as therein stated are to acquire, manage and maintain homes, rest homes, etc. for ''distressed and needy members in good standing of American Gold Star Mothers, Incorporated, in any State or Territory''; to receive funds and other property to be used for the ''protection, health, welfare and relief of sick, destitute, distressed and needy members in good standing of American Gold Star Mothers, Incorporated.'' The articles also provide for a board of five directors and prescribe that ''[a] majority thereof shall be members in good standing of American Gold Star Mothers, Incorporated''; the directors ''shall be the sole and only members of the corporation.''[1] Although the organization of a separate corporation was probably a violation of the convention's mandate (*cf. Shattuck* v. *Wood Memorial Home,* 319 Mass. 444 [66 N.E.2d 568, 573]), the original articles afford evidence of a deliberate effort to comply with the resolution of June, 1947 ; the corporate name ''American Gold Star Mothers, Incorporated, Memorial National Home Foundation'' definitely ties into that of the organization whose convention authorized the establishment of a national

---

[1] This limitation of membership in such corporations was then legal (Civ. Code, § 600), as it is now (Corp. Code, § 9603).

home for needy members. The restriction of membership in the new corporation to members of Gold Star, with such members dominating the board of directors, effectively placed the control in the parent corporation. At that point Foundation truly could be said to exist "under the auspices" of Gold Star and to be its subsidiary. Although Mrs. Boyd testified at the trial that she did not think of the home as an American Gold Star Mothers project and did not explore the possibility of working it out within the framework of Gold Star, and further declared that the resolution of June, 1947, did not control the Foundation, her conduct at the time of organizing that corporation paints a different picture which is far more persuasive than the assertions made at the trial of July, 1956.[2]

The fact of organizing a separate corporation, though contemplated by Mrs. Boyd in advance of the June, 1947 convention, was not then disclosed because, as she testified, she did not consider that necessary at the time. The fact was first stated in a bulletin sent by Mrs. Boyd to all chapters and members of Gold Star in July, 1947, the explanation being that this was necessary for exemption from taxes.[3] At that 1947 convention the members contributed 441 dollar bills to be used in establishing the home; additional donations had increased the total to $1,498 by the time said bulletin was issued.

When apprised of the fact of a separate organization, various members, chapters and officers of Gold Star became apprehensive and dissatisfied and there was acrimonious correspondence between them and Mrs. Boyd, who not only was president of Gold Star at the time but was also president of Foundation continuously from its organization and selected and dominated

---

[2] The court recited in its findings that it "does not question the honesty and integrity of Eleanor D. Boyd" but it specifically found that she "owed and still owes a fiduciary obligation to the defendant and cross-complainant, American Gold Star Mothers, Inc., and the members of its chapters and National Executive Board, in connection with her activities in forming and managing the Memorial National Home Foundation and acting as an officer and President of said corporation," and that such fiduciary obligation had been violated.

[3] This viewpoint was elaborated in a complaint filed by Foundation against Gold Star in 1952 seeking control of the assets of the trust. The pertinent allegation is that Gold Star "has no provision in its Constitution or By-Laws for its funds upon dissolution to be delivered to a nonprofit foundation or other corporation; that as a result thereof said defendant is unable to obtain an exemption from Federal Taxation Laws." But this theory does not appear to have been explained previously to Gold Star officers or members.

its board of directors at all times. In further bulletins to chapters and members, issued by her in October and December, 1947, she asserted that the authority of the June resolution had been carefully pursued and that a separate corporation was necessary for tax and other reasons. In the third bulletin (in December, 1947) she said: "I am now in receipt of a letter from the National President of the American Gold Star Mothers, Inc., demanding that the National Board have complete control of the Memorial National Home Foundation, that I surrender all monies to her and that I cease sending bulletins to the chapters. A bulletin has also been issued on her letterhead, which states that the Corporation has been rejected by the National Board.

"The Memorial National Home Foundation is still a legal and functioning corporation. It will remain so until action taken by legal delegates in a legally called annual National Convention of the American Gold Star Mothers, Inc. decrees otherwise.

". . . The Directors of the Memorial National Home Foundation have a dual obligation. Their responsibility lies not only in providing a National Home for distressed and needy members of American Gold Star Mothers, Inc., but they must conduct their affairs in such a way that no donor to the Memorial National Home Foundation shall ever question the singleness of purpose for which the funds they gave are applied.

"The National President and National Board of American Gold Star Mothers, Inc. have plenty to do to establish new chapters and carry on other work of the parent organization."

In January of 1948, before the June convention at which she was re-elected president of Gold Star, Mrs. Boyd caused the articles of Foundation to be amended. The name was changed to "Memorial National Home Foundation," thus dropping the words "American Gold Star Mothers, Incorporated." The provision that a majority of directors must be members of Gold Star was changed to read: "A majority thereof shall be Gold Star mothers (mothers whose children were killed in the service of the United States of America)." The purpose clause of the articles was amended to eliminate reference to members of Gold Star and to say, for the "welfare and relief of sick, destitute, distressed and needy Gold Star mothers (mothers whose children were killed in the service of the United States of America)." This was done without the consent or knowledge of Gold Star, its officers, or national

executive board. It was a plain attempt to change the scope of a charitable trust by mere amendment of the trustees' charter.

Counsel for appellants argue that this could be done lawfully but they cite no authority which supports the proposition. Reliance upon *In re Los Angeles County Pioneer Society, supra,* 40 Cal.2d 852, proves futile, for that case held that an attempted amendment of the charter which was in derogation of the trusts expressed in its original articles was nugatory, the court saying at page 862: ''Pioneer's course of conduct throughout these proceedings thus demonstrates that it has abused and abandoned its trust and amply supports the determination of the trial court that a new trustee should be appointed. [Citations.] ██ 'If the trustees abandon or in any way abuse their trust, equity will correct the abuses and remove the offenders.' '' It is obvious that a trustee cannot thus change the trust upon which it holds property. This attempt at ex parte divorce was doomed to failure.

██ In 1950 the Foundation articles were again amended to eliminate the words ''needy Gold Star Mothers (mothers whose children were killed in service to the United States)'' and to say: ''The purpose for which this corporation is formed is the acquisition and/or creation and operation of a non-profit home for parents of persons who served in the armed forces during World War II and who died of service connected illness or injury.'' In 1956 they were again amended to substitute these words: ''The specific, primary, and only purpose of this corporation shall be the establishment and maintenance of a non-profit home or shelter for destitute, distressed, or needy parents of persons who served in the Armed Forces of the United States during World War II and who died of service connected illness or injury.''

It should be noted that the Foundation articles as amended in 1950 and 1956 restrict its beneficiaries to the parents of victims of World War II, while those of Gold Star never have been restricted to any specific war or even to its own members. Its membership extends to ''mothers whose 'sons and/or daughters served and died in line of duty in World War I, World War II, or the Korean conflict, or died as a result of injuries received in such service.' '' As shown by its articles and the testimony of Mrs. Boyd ''one of the purposes of that organization is to help all Gold Star Mothers, whether they be members or not of [the] organization.''

The erroneous notion that this legerdemain of charter

amendments could succeed is reflected in Mrs. Boyd's activities at all subsequent times. Legerdemain would seem a harsh word were it not for the fact that Mrs. Boyd, who was re-elected president of Gold Star in 1948 and each successive year until 1952, who was at all times president and dominating personality of Foundation, actively, but without disclosing the attempted divorce, encouraged and solicited all chapters and members of Gold Star to raise money for the home through such familiar devices as bazaars, raffles, sales of plaques, donations in honor of the president's birthday, etc.; all this was done under the assurance that it was done for "your home." This procedure continued until Mrs. Boyd and Foundation openly repudiated any trust for members of Gold Star (as such) in May, 1953. At that time Foundation had accumulated from members' activities and similar sources, $73,577.12. All of it had been contributed, as found by the trial judge, "for the purpose of establishing a home for sick, destitute, distressed and needy mothers of the American Gold Star Mothers, Inc." As stated in June, 1949, by Mrs. Boyd, in a newspaper known as "Gold Star Mothers,"[4] the said funds "largely represent donations from individual chapters and from the mothers in memory of their sons, or other loved ones."

At the June, 1948, convention of Gold Star, where she was reelected president, Mrs. Boyd told the assembled members that the word "incorporated" had been dropped from the name of Foundation, but did not mention elimination of the words "Gold Star Mothers." She said (contrary to the existing fact) that the controlling vote in Foundation was with Gold Star and would so continue; also that Gold Star Mothers were in control; that the Foundation belonged and always would belong to Gold Star and "it is your organization."

Although the delegates made Mrs. Boyd president, they also adopted a resolution at the same convention, reading: "We, the members of American Gold Star Mothers, Inc., . . . desire that the National Memorial Home Foundation be an integral part of our organization under the supervision and management of our duly elected and appointed officers and committees." They rejected a proposed resolution worded as follows: "We, the delegates . . . desire that the present directors of the Memorial National Home Foundation, American

---

[4]Published by Gold Star but controlled by Mrs. Boyd in all respects and sent to all chapters and members of Gold Star.

Gold Star Mothers, be kept and the Foundation be under the present management." Mrs. Boyd, though not so stating to the convention, decided to ignore the resolution which had been passed, and actually reported to Foundation's attorney in Los Angeles that the other one had been adopted. At the trial she said: "I considered it null and void, having not carried or lost by the method we had used for resolutions," further explaining that it had not passed by a two-thirds vote. In fact, there was no such requirement in by-laws or custom. Never did she take any steps to conform to this resolution.

During World War II the United States Government had established at Long Beach a temporary project for defense workers and armed forces personnel consisting of about 90 acres of land with some 1,000 family dwelling units on it. It had been named Truman Boyd Manor in honor of Mrs. Boyd's son who had been killed in the service. As early as August, 1947, Mrs. Boyd began a campaign to induce the government to relinquish this project to Foundation as a home for Gold Star Mothers, under the authority of the Lanham Act (42 U.S.C.A. § 1581(b)). In these activities she contacted senators, representatives, Public Housing Administration officials and others having authority concerning the subject. She now claims to have acted solely as president of Foundation, but the record she made at the time refutes this contention. She told various senators that "Memorial National Home Foundation is incorporated to take care of the needy members of the American Gold Star Mothers, Inc., as well as other needy Gold Star Mothers and fathers.

"The American Gold Star Mothers, Inc. is a National organization qualified in the District of Columbia after World War I. The Memorial National Home Foundation was incorporated to take care of the needy Gold Star Mothers and Fathers on a National scale." Congressman Doyle of Long Beach was quoted in one of the letters in evidence as stating that "he participated with Mrs. Boyd in the Congressional and Navy Department discussions at the time the enabling legislation was passed, and that it was assumed on all sides that this was a charitable project of the American Gold Star Mothers, Inc." There was much correspondence with government officials, most of which was upon the letterhead of Gold Star and signed by Mrs. Boyd as president of that organization and chairman of the board of Foundation. She introduced herself and was introduced to various officials as president of Gold Star.

Finally, in 1950, an amendment was incorporated in the Lanham Act which was intended and understood to apply to Gold Star, viz.: "[W]here the Administrator determines that the housing involved is urgently needed by parents of persons who served in the armed forces during World War II and died of service-connected illness or injury."[5]

When formal application for relinquishment was made it was presented in the name of Foundation. However, it included a copy of a resolution adopted at the Gold Star Convention of 1949, reading: "RESOLVED that the American Gold Star Mothers, Inc. authorize the Chairman of Memorial National Home Foundation to proceed to acquire the emergency Housing Project . . . that project being ninety (90) acres, which assures us of plenty of room to take care of the mothers and fathers who need assistance; to be known as the Memorial National Home Foundation property for Gold Star mothers and fathers throughout the nation."[6] Also included was a financial statement of Gold Star written upon its own letterhead. This application caused surprise and questioning within the Housing Administration (which had jurisdiction over this matter) and it required that a relinquishment of the property to Foundation be approved in writing by Gold Star. When this was received, and the executive board of Gold Star had appeared in support of the application, same was approved, for the Housing Administration then concluded that "Memorial National Home Foundation was a corporation that had been established to take title to the property as an operating organization for" American Gold Star Mothers, Inc. The court found, upon adequate evidence, "that the Housing and Home Finance Agency, Public Housing Administration, did believe that the said Truman Boyd Manor was being conveyed to an organization which was an integral part

[5]This was the language of the statute at the time of relinquishment to Foundation was approved on June 7, 1950, "for the purposes of acquiring and operating a Home for the parents of persons who served in the Armed Forces during World War II and who died of service connected illness or injury."

By amendment of October 26, 1951, the words "during World War II" were stricken and the following phrase was substituted, "at any time on or after September 16, 1940, and prior to July 26, 1947, or on or after June 27, 1950, and prior to such date thereafter as shall be determined by the President." (65 Stat. 648, ch. 577, § 2.)

[6]The corporate name of Gold Star did not include "Inc." until the amendment of November, 1950. It is a fair inference that the phrase "Gold Star Mothers" had a generally accepted secondary meaning which signified respondent corporation and its members.

of and controlled by the defendant, American Gold Star Mothers, Inc.'' Before the matter could be accomplished the Korean conflict arose and a freeze was placed on all such relinquishments.

Early in 1953 the subject of lifting the freeze on this property was considered and the question again arose whether Foundation would be a proper grantee. Mrs. Boyd then furnished the authorities a copy of a resolution adopted at the Gold Star Convention of 1952, to the effect ''that the National Executive Board of the American Gold Star Mothers, Inc., uphold and recommend the continuance of the policy of the Memorial National Home Foundation, also, that in accord therewith each chapter shall proceed to annually elect a member to the advisory committee of the Memorial National Home Foundation. . . .'' Careful scrutiny of this resolution shows that it related only to the policy of the Foundation to have members of Gold Star upon its advisory committee. But the resolution satisfied the government officials, the freeze was lifted and the property deeded to Foundation on May 29, 1953, for a price of $138,404.63[7] with a down payment of $944.66. The entire balance was paid in the ensuing year out of current revenues from the property, which grosses approximately $500,000 a year. An appraisal made for Foundation showed a value of $2,698,143.15.

An action was brought in June, 1952, by Foundation against Gold Star to establish its right to all the trust property. It was later voluntarily dismissed and was followed by another similar action filed on July 31, 1953, which was likewise dismissed.

The deed to the government property having been received in May, 1953, Mrs. Boyd in that same month openly repudiated any trust for the benefit of members of Gold Star. This she did through a news release given to the Long Beach Independent. It said, in part: ''Memorial National Home Foundation was incorporated in July, 1947, while Mrs. Boyd was National President of Gold Star Mothers. It has no connection with that organization, however, except that Gold Star Mothers have been invited to name an advisory board.'' No convention of Gold Star members had been told that these corporations were independent. Mrs. Singer, who was president of Gold Star at the time of trial, testified that she always

---

[7]This represented the cost of the land to the Government of $133,182.49, plus a payment in lieu of taxes of $4,277.48, and the sum of $944.66 for accounts receivable.

believed that control and ownership of Foundation was in Gold Star; also that Mrs. Boyd always said at chapter meetings "this is yours. It is for American Gold Star Mothers." Mrs. Broom, who was first vice president of Gold Star during all the years of Mrs. Boyd's incumbency as president, never learned of the amendments to the charter of Foundation until 1953. Mrs. Boyd testified at the trial that she did not feel that Gold Star was the parent organization of Foundation.

Shortly after the press release the 1953 Convention of Gold Star was held in June, and a resolution was there adopted "that the National Executive Board of American Gold Star Mothers, Inc., be, and it is hereby authorized and directed, in order to protect the interests of the members and Chapters of American Gold Star Mothers, Inc., to take all action and to do all things as said National Executive Board shall, in its sole discretion, deem necessary and proper, for bringing about a change in the control, management and operation of Memorial National Home Foundation so as to place the said control, management and operation of such Foundation in the duly authorized representatives of American Gold Star Mothers, Inc. . . ."

In May, 1951, while the Long Beach property was frozen, Foundation, without consulting Gold Star, its officers or executive board, acquired certain property at Ojai, California, professedly as a home "for Gold Star parents." The court found "that the said property was purchased as a home for 'needy and distressed parents' of American Gold Star Mothers, Inc." The property consists of eight acres which then had on it a single residence and servants' quarters. The purchase price was $55,330, and Foundation spent $20,212.74 on improvements, consisting mainly of a single cottage which was supposed to be a model of homes for needy mothers. The court found that the initial payment on the purchase price "was from funds contributed by American Gold Star Mothers, Inc., its National Executive Board, and its members, chapters and friends." Though no finding to that effect was made, it seems a fair inference that later payments on the price and other expenses came from the earnings of Truman Boyd Manor. All contributions had been mingled as received and appellants' brief says: "Exhibit X shows that all of the net cash receipts through May 31, 1952, were invested in the Ojai property excepting only the sum of $1,097 shown as cash unrestricted at that date." The Ojai property has had a total

income of less than $2,000 and a total loss of over $40,000, an average of $8,000 a year. The purchase was made somewhat hurriedly so that Mrs. Boyd could announce at the June Convention of Gold Star the existence of a home for mothers.

The property was and is zoned for single family residence. After its purchase an effort was made by Foundation to change the zoning, but this failed because of protests of neighbors who stressed a shortage of water in the area. Foundation has no license from the state to care for needy persons, and no definite plans have been made for the further improvement of this property. The only permanent resident has been a caretaker. There have been a few overnight and weekend guests. Foundation also obtained an option to buy an adjoining 32 acres and Mrs. Boyd solicited all chapters and members of Gold Star to contribute $200 per chapter toward the option price. Addressed to "Dear Presidents and Chapter members of American Gold Star Mothers, Inc.," one appeal commenced as follows: "Memorial National Home Foundation was organized to benefit our Gold Star Mothers and Fathers." After the June, 1953, resolution of the Gold Star Convention, Foundation placed on a single door in the Ojai "Manor House" a plaque reading: "The American Gold Star Mothers, Inc." and has since contended that the total property owned by it and devoted exclusively to the needy members of Gold Star "is a bedroom at Ojai of 187 square feet in area, together with the right to use jointly with other occupants a service area of 2407 square feet, not counting 8.14 acres of land." This was based upon the amount of contributions made prior to the amendment of Foundation's articles in January, 1948, —$2,170.08. Ojai has at all times been a dead loss and promises to be so for an indefinite future time.

The foregoing review of the evidence (which of course is based upon the testimony, exhibits and inferences favorable to respondents; *Nichols* v. *Mitchell,* 32 Cal.2d 598, 600 [197 P.2d 550]; *New* v. *New,* 148 Cal.App.2d 372, 383 [306 P.2d 987]), amply sustains the court's findings that all funds accumulated prior to the purchase of Truman Boyd Manor "were funds accumulated for benevolent and charitable purposes and held in trust by the Memorial National Home Foundation for the purposes as set forth in paragraph III herein," which means for the benefit of members of Gold Star in good standing; also that Truman Boyd Manor is held in trust "for 'needy and distressed parents' of World War II veterans for the purposes

as set forth in paragraph III herein, but limited to needy and distressed parents of World War II veterans."[8]

It thus appears that there were imposed upon Foundation two trusts, one of which is for the benefit of all needy members of Gold Star, and the other, Truman Boyd Manor, for the benefit of needy parents of World War II victims. The first classification grows out of the specific declaration of Foundation's original articles of incorporation and the second out of the circumstances attending the acquisition of Truman Boyd Manor, the statute being expressly restricted to providing relief for World War II parents. The Ojai property probably falls partially within each of the two classifications for it was acquired primarily with funds contributed by members of Gold Star for the expressed purpose of establishing a home for members and secondarily from funds derived from operation of Truman Boyd Manor (for World War II parents only).[9]

■■■ The evidence also supports the finding "that the defendant and cross-defendant, Memorial National Home Foundation, has abused and abandoned its trusts and new trustees should be appointed to carry out the terms of the trusts." This is true because all funds and property have remained throughout all the maneuvers of Foundation impressed with a trust for the exclusive benefit of members of Gold Star, except property which is held in trust for the exclusive benefit of needy parents of victims of World War II,[10] namely, Truman Boyd Manor and the Ojai property; that is to say, that Foundation, as the subsidiary of Gold Star, initially committed itself to a trust for the benefit of members of Gold Star, has never been released from this dedication and could not without concurrence of Gold Star and the court release itself from that fiduciary obligation through charter amendment or other de-

---

[8]The phraseology of the statute as amended in 1951 (see footnote 5, *supra*) is broad enough to include the Korean conflict, but the conveyance to Foundation was made on the basis of the 1950 approval of relinquishment and the statute then prevailing.

[9]Under Gold Star management the trust has a wider scope, relief of all Gold Star mothers whether members of the organization or not, except as to Truman Boyd Manor and (in part only) the Ojai property; the benefit of the Long Beach property is limited to parents of World War II victims in its entirety; but Ojai was acquired from two sources, only one of which is limited to World War II parents; the exact proportion must be determined through the accounting ordered by the trial court.

[10]By courtesy, husbands of members of Gold Star become associate members if they are parents of the victims of the designated wars, World War I, World War II, and the Korean conflict.

vice. So far as Truman Boyd Manor is concerned (and to some extent Ojai), the trust was narrowed to parents of World War II victims through the circumstances of the grant, but it still remains for the benefit of members (regular and associate) of Gold Star. Foundation persists in denial of any obligation to members of Gold Star, as such, and thereby it continues to repudiate its trust and to emphasize the necessity for its removal as trustee.

As an additional ground for removal, the court also found "that hostility, strife and antagonism has existed and does exist between members of the Board of Directors of the defendant, Memorial National Home Foundation, and particularly between its president, Eleanor D. Boyd, and members of the American Gold Star Mothers, Inc., and its National Executive Board. The Court further finds that the defendant and cross-defendant, Memorial National Home Foundation, and its President, Eleanor D. Boyd, cannot, with fairness and impartiality, carry out the provisions of its charter, insofar as its beneficiaries are concerned, under existing conditions without detrimental results to its trusts and beneficiaries." Also, that Mrs. Boyd dominates Foundation and "is unduly influenced by passion and prejudice emanating from personal differences with members of the National Executive Board and members of the chapters of the American Gold Star Mothers, Inc."

The record is replete with illustrations of hostile reaction on Mrs. Boyd's part to any questioning or criticism of her regime. Reference has been made above to the two actions brought in 1952 and 1953 by Foundation against Gold Star in an effort to exclude it from the management of the trust. Smaller incidents are also revealing. In response to one member's question about the acquisition of a home, Mrs. Boyd said "that she was taking care of it and we would be informed when she was ready." She told the 1951 Convention: "We are directed to take care of the Memorial National Home Foundation and not ask so many questions that are not necessary to be told to you at this time." When told that a Mr. Geisler had a photostatic copy of the charter amendments, Mrs. Boyd said: "You had no business to go down there. That isn't any of your business at all. That is the business of the Memorial National Home Foundation." When Mr. Geisler replied that he thought it the business of all members of Gold Star, she further said: "Well, I don't interfere in your business, and I don't think you should interfere in mine, and this is my business." On

another occasion when Mrs. Geisler referred to having photostatic copies of the amendments, the following colloquy occurred: Mrs. Boyd: "You misrepresented or you could not have gotten them." Mrs. Geisler: "I did not misrepresent, the record books are open to all who wish to see them." Mrs. Boyd: "You had to swear you were entitled to them; you had to tell a lie to get them; you could not have gotten them otherwise." In 1949 a dissident faction of Gold Star organized an entity known as National Gold Star Mothers, and the October issue of the paper "Gold Star Mothers" referred to them as "quislings" and "fifth columnists" and "not honorable Americans."

As to Mrs. Boyd's lack of experience and lack of qualification to manage a two million dollar trust, the history of Ojai above recited furnishes potent proof. The administration of the Long Beach property is also convincing. The city of Long Beach has an ordinance which permits temporary housing until 1961 only; it would cost a million dollars to bring the Truman Boyd Manor up to the ordinance standard; though its gross income is a half million dollars a year, no reserve fund has been set up and no plans have been made to do this work or otherwise construct a home on the premises. True, preliminary drawings were made after this action was filed, but when presented to the City Council of Long Beach they were rejected because the proposed location is directly in the path of a freeway which the State intends to put through the property. The same is true of a duplex plan and a hospital plan submitted to the city. Not more than 20 to 30 Gold Star parents have been given housing in the 994 rental units of this property; they are in scattered units; there are about 300 Navy families there who pay no more rent than do the Gold Star parents. During this long period of relative inactivity and bickering the rents have been accumulating, the total in bank on May 31, 1956 being $103,697.64. Dr. Boyd, husband of appellant, operates a clinic upon the premises but Mrs. Boyd was unable to testify to any facts about his arrangement with Foundation, what rent he paid or whether it ever had been changed.

■ A charitable trustee will be removed on the same grounds as the trustee of a private trust. Volume 3, Scott on Trusts, section 387, page 2049: "A trustee of a charitable trust may be removed as trustee for the same reasons for which a trustee of a private trust may be removed. Thus he may be removed for serious breaches of trust, for unfitness,

for long continued absence and the like. He can also be removed where his views are hostile to the purposes of the trust, as in the case of a religious trust where he ceases to hold religious views which it is the purpose of the trust to promote.'' To the same effect, see, Restatement of Law of Trusts, section 387, page 1181. That diversion of trust funds to unauthorized uses, inefficiency and mismanagement, hostility to the beneficiaries, assumption of an adverse trust, afford good grounds for such removal is well established.

Civil Code, section 2232 : ''No trustee, so long as he remains in the trust, may undertake another trust adverse in its nature to the interest of his beneficiary in the subject of the trust, without the consent of the latter.'' Section 2234: ''Every violation of the provisions of the preceding sections of this article is a fraud against the beneficiary of a trust.'' ''The power of a court of equity to remove a trustee, and to substitute another in his place, is incidental to its paramount duty to see that trusts are properly executed; and may properly be exercised whenever such a state of mutual ill-feeling, growing out of his behavior, exists between the trustees, or between the trustee in question and the beneficiaries, that his continuance in office would be detrimental to the execution of the trust, even if for no other reason than that human infirmity would prevent the co-trustee or the beneficiaries from working in harmony with him, and although charges of misconduct against him are either not made out, or are greatly exaggerated.'' (*May* v. *May*, 167 U.S. 310, 320, 321 [17 S.Ct. 824, 42 L.Ed. 179].) ''If hostility between trustee and beneficiary is such that the best interests of the trust are jeopardized, the trustee will be removed.'' (45 A.L.R. 331, 333.)

 The pleas of laches and estoppel which are aimed at Gold Star cannot be sustained. Firstly, the complaint of the attorney general, as is hereinafter shown, sustains this proceeding regardless of capacity of Gold Star to complain of Foundation's mismanagement or repudiation of the trust. Secondly, the proper administration of a benevolent trust, especially the prevention of departures from its legitimate objects and the redressing of breaches and repudiations of the trust, are matters of large public interest which preclude application of the doctrines of laches and estoppel and particularly so in an action brought by the attorney general. ''No length of diversion from the plain provisions of a charitable trust will prevent restoration to its true purpose.''

(*William Buchanan Foundation* v. *Shepperd*, (Tex. Civ. App.) 283 S.W.2d 325, 336.) ''The lapse of many years is no bar to such action. 'Generally it is true that no length of time of diversion from the plain provisions of a charitable foundation will prevent its restoration to its true purpose.' '' (*Shattuck* v. *Wood Memorial Home, supra*, 319 Mass. 444 [66 N.E.2d 568, 573].) To the same effect, see *Trustees of Andover T. Seminary* v. *Visitors of Theological Inst.*, 253 Mass. 256 [148 N.E. 900, 918].

 Appellants argue that neither the attorney general nor Gold Star (which filed a cross-complaint herein) has authority to maintain this action.

As to the attorney general, appellants rely primarily upon section 9505, Corporations Code, which says: ''A nonprofit corporation which holds property subject to any public or charitable trust is subject at all times to examination by the Attorney General, on behalf of the State, to ascertain the condition of its affairs and to what extent, if at all, it may fail to comply with trusts which it has assumed or may depart from the general purposes for which it is formed. In case of any such failure or departure the Attorney General shall institute, in the name of the State, the proceedings necessary to correct the noncompliance or departure.'' Section 10207, which appears in the part covering corporations organized for charitable or eleemosynary purposes, contains almost identical language. Counsel say that the statute imposes a condition precedent to a suit by the attorney general, namely, a finding by him that there has been a failure to comply with the trust or a departure from its general purposes; that such finding was not made at bar and therefore the predicate for a suit by the attorney general was not laid. Emphasis is placed upon the fact that this is an action for declaratory relief. The complaint alleges that Foundation has possession and control of charitable trust assets of the value of approximately one million dollars; that Gold Star contends it is entitled as trustee to possession and control of same; that Foundation claims it is entirely independent and not subject to control of Gold Star and is the only proper trustee of said charity; that plaintiff has been unable to determine ''the precise nature and extent of the charitable trust and/or trusts involved, or to resolve the dispute between said defendants regarding the right to possession and/or control, as Trustees, of the aforesaid charitable trust assets.'' Also, ''that all the charitable trust assets chargeable to and in the possession

and/or under the control of defendant, Memorial National Home Foundation, were solicited by and tendered to said Memorial National Home Foundation with the understanding that said assets were to be administered by the American Gold Star Mothers, Inc., and that at least a substantial portion of said assets would be devoted toward the rendering of aid and assistance to needy and distressed members of said American Gold Star Mothers, Inc.'' Again, that public interest requires a prompt determination of the nature and scope of the charitable trust or trusts involved, and the designation of the proper trust or trustees to accomplish the purpose or purposes of same. The prayer is for judgment determining the nature and scope of the trusts and which defendant is the proper trustee of each trust; that ''defendants be required to account for all assets properly chargeable to said trusts to enable the court to further clarify the rights and duties of plaintiff in hereafter enforcing and supervising said trusts, as his statutory and common-law duty. Plaintiff also prays for such other and further relief as the court may deem just in the premises, including costs of suit incurred herein.''

It is true that the complaint makes no allegation of a breach of trust or departure from its general purposes. But section 9505 does not impose such a finding as a condition precedent to any suit by the attorney general. All counsel seem to agree that that official has an historic right and duty to supervise charitable trusts and to maintain such actions as may be appropriate to protect the public interests therein. Volume 3, Scott on Trusts, section 391, page 2052, says: ''In England the records show that even before the enactment of the Statute of Charitable Uses in 1601 suits were brought by the Attorney General to enforce charitable trusts. The community has an interest in the enforcement of such trusts and the Attorney General represents the community in seeing that the trusts are properly performed.'' *People* v. *Cogswell*, 113 Cal. 129, 136 [45 P. 270, 35 L.R.A. 269] : ''The state, as *parens patriae*, superintends the management of all public charities or trusts, and, in these matters, acts through her attorney general. Generally speaking, such an action will not be entertained at all unless the attorney general is a party to it. Such was the rule at common law, and it has not been changed in this state. Even in those states, such as Massachusetts, where, by a special statute, the attorney general is instructed to prosecute such actions, it is declared that the statute does not narrow or diminish in this regard the common-law powers incident

to the office. (*Parker* v. *May*, 5 Cush. [Mass.] 336.) The principle and rule are thus succinctly stated in *Attorney General* v. *Compton*, 1 Younge & C. C. [Eng.] 417: Where property affected by a trust for public purposes is in the hands of those who hold it devoted to that trust, it is the privilege of the public that the crown should be entitled to intervene by its officers for the purpose of asserting, on behalf of the public generally, the public interest and the public right, which, probably, no individual could be found effectually to assert, even if the interest were such as to allow it. (2 Kent's Commentaries, 10th ed., 359; Lewin on Trusts, § 665; 1 Daniell's Chancery Practice, § 13; Perry on Trusts, § 732.)'' ▆▆▆ The soundness of this ruling is emphasized by the California concept that ''[t]he attorney-general, as the chief law officer of the state, has broad powers derived from the common law, and in the absence of any legislative restriction, has the power to file any civil action or proceeding directly involving the rights and interests of the state, or which he deems necessary for the enforcement of the laws of the state, the preservation of order, and the protection of public rights and interests.'' (*Pierce* v. *Superior Court*, 1 Cal.2d 759, 761-762 [37 P.2d 453, 460, 96 A.L.R. 1020].) ▆▆▆ The Legislature presumptively was cognizant of the Cogswell decision when enacting section 605c Civil Code in 1931 (Stats. 1931, ch. 871, p. 1852), and codifying it as section 9505, Corporations Code, in 1947. It is to be inferred that there was no intention to change the law by stripping the attorney general of a recognized and important function in the absence of clear and explicit language so indicating. ▆▆▆ *Guardianship of Thrasher*, 105 Cal.App.2d 768, 777 [234 P.2d 230]: '' '. . . it is not to be presumed that the legislature in the enactment of statutes intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication. (*Lowe* v. *Yolo County Consolidated Water Co.*, 8 Cal.App. 167, 174 [96 P. 379]; 23 Cal.Jur. 782, § 158.)' '' See also *Freeman* v. *Jergins*, 125 Cal.App.2d 536, 552-553 [271 P.2d 210]. ▆▆▆ The utmost effect to be attributed to section 9505 is the imposition upon the attorney general of an additional obligation (rather than a mere discretion) to institute suit when he has concluded after investigation that there has been a breach of a charitable trust or a departure from the general purposes for which the corporation was formed. ▆▆▆ There

was no error in ruling that the present suit is properly maintained by the attorney general.

Appellants' argument that Gold Star has no capacity to maintain its cross-complaint rounds out the thought that nobody can maintain an action to correct abuse in administration or repudiation of a charitable trust until the attorney general has made an investigation and reached the decision specified in section 9505, Corporations Code. The argument is that Gold Star has proceeded upon the theory that it has standing to sue as creator of the trusts held by Foundation, or that it represents the donors to those trusts. It seems to be the law of this state that the trustor or donors of a charitable trust cannot maintain an action such as this independently of the attorney general. *O'Hara* v. *Grand Lodge I. O. G. T.*, 213 Cal. 131, 139 [2 P.2d 21], says: "[E]ven if defendant be treated as the creator of this trust, it does not appear what standing it has in this action to claim any interest in the real property. Defendant parted with its entire interest in the property for a valuable consideration, subject to the trust, and retained no reversionary interest therein. Under such circumstances, it has no standing in a court of equity, except as a relator, to attempt to compel the proper execution of the trust, or to claim any interest in the trust property. The law is well settled that when property has become fully vested in trustees for a valid charitable purpose, neither the creator of the trust nor his heirs or assigns have any standing in court in a proceeding to compel the proper execution of the trust, except as relators." To the same effect are *Pratt* v. *Security Trust & Savings Bank*, 15 Cal.App.2d 630, 640 [59 P.2d 862]; *Geo. Pepperdine Foundation* v. *Pepperdine*, 126 Cal.App.2d 154, 161 [271 P.2d 600].

The Gold Star pleading named the attorney general as cross-defendant, and that official filed an answer which admitted or denied various allegations and concluded with the prayer "that the Court hear and determine all the issues raised by the pleadings herein and that it enter judgment accordingly, including the awarding to this answering cross-defendant of costs of suit and such other and further relief as the Court may deem just in the premises."

A relator is a party in interest who is permitted to institute a proceeding in the name of the People or the attorney general when the right to sue resides solely in that official. The term is thus defined in Rawle's Third Revision of Bouvier's Law Dictionary, page 2863: "At common law,

strictly speaking, no such person as a relator to an information is known, he being a creature of the statute of 9 Anne. In this country, even where no similar statute prevails, informations are allowed to be filed by private persons desirous to try their rights, in the name of the attorney-general, and these are commonly called relators." The attorney general prescribes his own rules for granting such consent and they may be entirely informal.

In *People* v. *San Francisco*, 36 Cal. 595, 605, an interested party filed a mandamus proceeding under the title of *People* ex rel. *Ferguson*. The application and notice thereof were signed by the attorney for the relator, but not by the attorney general. The court said in this connection: "Though the Attorney General did not sign the notice, he unites in the brief in support of the application, and thereby, impliedly at least, consents to the use of the name of the People." That ruling is applicable at bar. The attorney general has impliedly consented to the prosecution of the cross-complaint by Gold Star standing in the position of a relator. Not only did he do so by his pleading, but the deputy attorney general in charge of the case stated, in closing his argument below: "Upon a complete examination of this record and with the great realization of what I am about to advocate, it is my earnest conclusion that, with the view in mind to properly benefiting the beneficiaries in carrying out the trust purposes, removal of the present trustee is essential." The attorney general has also filed a respondent's brief in this court which argues: "The Findings of Fact are Fully Supported by the Evidence and Required the Removal of Memorial National Home Foundation as Trustee. . . . The Trial Court Properly Removed Memorial National Home Foundation as Trustee of Charitable Assets," and concludes: "This respondent concludes that the evidence and the law clearly supports the decree and the procedure by which it was obtained. . . . This respondent concludes that this action was proper and was more than justified by the substantial evidence elicited." We hold that Gold Star's cross-complaint was properly entertained by the court, even if it were to be conceded (which we do not) that the attorney general's own complaint was not sufficient to sustain the action.

 Next it is argued that the removal of Foundation as trustee stripped it of all its assets and therefore operated as a dissolution; that an action in *quo warranto* is the ex-

clusive applicable procedure, and it cannot be pursued without compliance with section 4691, Corporations Code, which gives the corporation an opportunity to cure its derelictions by charter amendment or other corporate action.[11] It appears, however, that this section applies only to an action brought under section 4690, not strictly *quo warranto* but one "to procure a judgment dissolving the corporation and annulling, vacating, or forfeiting its corporate existence."

"Apart from statutes extending the existence of, or conferring powers upon, corporations for the purpose of winding up their affairs, the dissolution of a corporation implies the termination of its existence and its utter extinction and obliteration as an entity or body in favor of which obligations exist or accrue or upon which liabilities may be imposed." (13 Am.Jur., § 1342, p. 1191.) See also Restatement of Conflict of Laws, section 157, comment a, page 227. The instant action has no such purpose; it leaves Foundation intact as a corporation, qualified to undertake and administer any new charitable trusts which do not impinge upon those whose administration has been taken from it. *In re Los Angeles County Pioneer Society, supra,* 40 Cal.2d 852, has established the law for this state that a court of equity may remove a corporate trustee of a benevolent trust and transfer to another fiduciary the management of all property held by it for such purpose. There is no merit in the contention that *quo warranto* was the exclusive, or indeed the appropriate, remedy to be pursued at bar.

Absence of indispensable parties is urged on two grounds,—that the directors of Foundation and the United States are in that category.

As to the directors, the argument proceeds as if the action sought their removal from office, which obviously is not the case. Authorities cited to the proposition that the directors are essential parties to such an action are not in point. Although the corporation was removed as trustee of all the trust assets in the instant case, the corporation is not dissolved and

---

[11]Corp. Code, § 4691: "However, if the cause of action is a matter or act which the corporation has done or omitted to do that can be corrected by amendment of its articles or by other corporate action, such suit shall not be maintained unless (a) the Attorney General, at least 30 days prior to the institution of suit, has given the corporation written notice of the matter or act done or omitted to be done, and (b) the corporation has failed, neglected, or refused to institute proceedings to correct it within the 30-day period or thereafter fails to prosecute such proceedings."

the directors remain able to function as such. Title to the trust assets was vested in the trustee, not in the directors, and the judgment takes nothing from them to which they were entitled as individuals. They were neither indispensable nor necessary parties.

 The United States is not an indispensable or necessary party. The contention that it is rests upon a collateral agreement made at the time the government deeded Truman Boyd Manor to Foundation. That was done by quitclaim deed which contained no covenants or conditions. A contemporaneous agreement was made between the United States, ''represented by the Department of the Navy,'' and the Foundation, under date of May 27, 1953. It recites the request of Foundation for transfer of Truman Boyd Manor pursuant to the Lanham Act, also the willingness of the Administrator of the Housing and Home Finance Agency to effect the transfer ''on the expressed condition that a satisfactory agreement be entered into between the Foundation and the Department of the Navy, with respect to operation of the project, its availability for occupancy by persons engaged in defense or mobilization activities and reasonable rentals.'' Then follows the agreement that so long as there is a defense need for the project, as determined by the Navy, Foundation will continue to operate it for housing purposes and maintain reasonable rents, that it will give preference to military and other defense personnel in filling vacancies, will consult with the naval commander prior to changing any rent schedules, and in the event of hostilities will, if requested by the Navy, make the project available for full military use. The condition mentioned was that a satisfactory agreement be made, and when the agreement under discussion was executed the condition had been performed and hence ceased to be further operative. At best, its violation could amount to a partial failure of consideration (Foundation paid $138,404.63 for the property),—partial failure which the United States might be able to capitalize in some proceeding brought for that specific purpose. But this agreement left no cognizable interest in the property in the United States. Its rights, if any, growing out of a prospective violation of the agreement could not be affected by the judgment at bar, for the receivers and the new trustee take with full notice of the contract and become subject to all the sanctions which could be invoked against Foundation with respect to it. Under the principles announced

in *Bank of California* v. *Superior Court*, 16 Cal.2d 516, 520-524 [106 P.2d 879], the United States cannot be held a necessary or an indispensable party to this action.

Finally, appellants argue that ''[t]he trial court has in effect determined that it, rather than Congress and the Housing and Home Finance Agency, should determine who is to manage Truman Boyd Manor''; and that ''[t]he contract between the United States and Memorial National Home Foundation demonstrates that the United States has not completely disposed of Truman Boyd Manor.'' Hence, counsel say, this judgment interferes with the power of Congress to dispose of and make all needful regulations concerning property of the United States. (U.S. Const., art. IV, § 3, clause 2.) There is no merit in this contention for, as shown above, United States parted with its entire interest in Truman Boyd Manor; if perchance it has any rightful complaint as to performance of the contract with the Navy above discussed, that right is not affected by the judgment herein.

No other points concerning the judgment require discussion.

### Appeal From Order Fixing Compensation
### of Receivers

By the judgment herein the court appointed Messrs. Roy E. Allen and George D. Lyon receivers of all the trust property ''pending the appointment of a new trustee, or trustees.'' They qualified, took possession and in due course presented their Report and First Account Current wherein they prayed for an allowance of compensation and averred that their ''joint work is reasonably and fairly worth $2,500.00 per month.'' Supporting testimony was given. As the court was about to rule, counsel for appellant Foundation objected to payment of any moneys to the receivers ''out of the funds of Memorial National Home Foundation'' on the ground of lack of jurisdiction, the reference apparently being directed to jurisdiction over the action and jurisdiction to appoint a receiver. The court made its ''Order Approving, Settling and Allowing Report and First Account Current of Receivers, Fixing Compensation of Receivers, etc.,'' stating that ''the circumstances are such that this is an appropriate case for allowance of compensation to the receivers on a salary basis, and that the fair and reasonable value of the services of the said receivers in their capacity as such receivers in this action is the sum of $2,500.00 per month, pending the further order of this court. . . . That the said receivers be and hereby are

allowed, pending the further order of this court, the sum of $2,500.00 per month for their services as such receivers herein, and that out of the funds in their possession, they are authorized to disburse $1,250.00 per month to each of the said receivers, from the date of their qualification herein as such receivers, pending the further order of this court.'' From this order Foundation has taken appeal Number 22871.

No contention is made that the award is excessive, or that the court abused its discretion in any respect. Appellant's brief says: ''The resolution of the instant appeal would seem to be governed by the disposition of the appeal by appellant from the interlocutory judgment which among other things appointed the respondent receivers''; also, ''[a]s earlier stated, the resolution of this issue is ancillary to and dependent on the decision of the main appeal in No. 22766.''

Appellant argues two points, (1) that the court had no jurisdiction over the action, hence the order appointing receivers is void and the costs of same cannot be assessed against the receivership assets but must be borne by the party which secured the void order;[12] (2) that, even if the appointment was not void, where ''the party objecting to the receivership has the property restored on the merits, the general rule is that the receiver is not entitled to compensation out of the property but instead must look to the applicant for the receiver for such compensation.''

Our disposition of the appeal from the judgment reveals that the court had jurisdiction over the action and hence possessed incidental jurisdiction to appoint receivers pursuant to the usages of equity (Code Civ. Proc., § 564, subds. 3, 4; *Bowles* v. *Superior Court*, 44 Cal.2d 574, 584 [283 P.2d 704]).

The affirmance of that judgment precludes the possibility of restoration of the property to appellant upon the merits and renders any discussion of the contrary hypothesis wholly unnecessary. However, we suggest in that connection that the allowance to receivers on a monthly basis was made ''pending the further order of this court.'' Mr. Allen testified: ''I do not feel that a court setting a salary is bound, after the event, to maintain that salary longer. We would like to have some idea of what we are being paid''; and counsel for the receivers say in their brief: ''It should be remembered that permitting the receivers to look to the fund in the first in-

---

[12]Apparently the receivers were appointed on the court's own motion in order to protect the assets pending appointment of a successor trustee.

stance and as between themselves and the parties, does not necessarily settle the ultimate incidence of liability for the receivership costs and expenses. These may be allocated against all or some of the parties in accordance with the circumstances and the purpose of bringing about a fair result. That, however, is a matter which need not—indeed, probably cannot—be reached until the receivership has been finally disposed of.'' We agree that affirmance of the order, phrased as it is, does not control the future action of the court upon the matter of receivers' compensation.

### MULTIPLICITY OF APPEALS

The notice of appeal from the judgment, and the whole thereof, adds the words ''including the Minute Order of the above entitled Court entered on October 24, 1956, signed on the 7th day of December, 1956 and entitled 'Interlocutory Judgment' and all preliminary orders and rulings of said Court in the above entitled action to the Supreme Court of the State of California.'' That minute order directs the ''Attorney General to prepare the Interlocutory Judgment and Restraining Order''; hence the minute order is not appealable. (*Herrscher* v. *Herrscher*, 41 Cal.2d 300, 304 [259 P.2d 901].) The other matters mentioned in the omnibus clause of the notice are not appealable.

The notice of appeal from the order allowing compensation to the receivers specifies both the formal order and the minute order which preceded it. That appeal was heretofore dismissed by this court so far as it relates to the minute order.

The judgment and the order approving, settling and allowing report and first account current of receivers, fixing compensation of receivers, etc., are affirmed. All other appeals are dismissed.

Fox, P. J., and Herndon, J., concurred.

Petitions for a rehearing were denied August 27, 1958, and the petitions of appellants Memorial National Home Foundation and Eleanor D. Boyd for a hearing by the Supreme Court were denied September 24, 1958.