[Civ. No. 27289. Second Dist., Div. Two. Mar. 9, 1964.]

STANLEY MOSK, Attorney General, Plaintiff and Appellant, v. SUMMERLAND SPIRITUALIST ASSOCIATION et al., Defendants and Appellants; NAOMI M. MORGAN et al., Interveners and Respondents.

378

Stanley Mosk, Attorney General, and Edmond B. Mamer, Deputy Attorney General, for Plaintiff and Appellant.

Trevey, Schwartz, Wood & Otero and Jack A. Otero for Defendants and Appellants.

Robertson & Westwick and Robert J. Westwick for Interveners and Respondents.

ROTH, J.— In 1890 H. L. Williams (Williams) executed a duly recorded declaration of trust (Williams Trust) wherein certain real property in Summerland, County of Santa Barbara (hereinafter referred to as "Temple Site") was conveyed to three trustees "for, the establishment of and as a site for the building of a Spiritual Temple to be by them held until the establishment of an organized society in Summerland devoted to the promotion of Spiritualism, whereupon said Trustees hereinabove named shall upon the written request of myself or of my successors in title convey said land and premises to the governing board or body of said society or to one or more trustees whom said society may appoint, subject to such conditions and limitations only . . . ."

Williams died in 1892 or 1893, and his estate was distributed in 1929.

From time to time successor trustees were named for the three original trustees by order of the Superior Court of California in and for the County of Santa Barbara, and defendants Milton Duncan, Steven Granaroli, Jr., and Jack Lambert now are and were the duly appointed successor trustees at the time of the commencement of this action.

On July 1, 1960, the Attorney General as plaintiff filed a complaint against Summerland Spiritualist Association (Summerland), a California nonprofit corporation, and the three trustees named above to enforce the Williams Trust, alleging it to be a charitable trust, that the individual defendants then were successive trustees thereof and hold title to the Temple Site as such trustees, that Summerland qualifies to be successor trustee of the trust assets to carry out the trusts' charitable purposes, that plaintiff is charged with the

supervision and enforcement of charitable trusts, and prayed that the court make appropriate orders for the transfer of the Temple Site to Summerland to carry out the trust purposes provided for by the trust instrument, and that if such trust purposes could not reasonably be accomplished, the court apply the doctrine of *cy pres* and order the transfer of the real property to a qualified trustee for the accomplishment of comparable charitable purposes.

The default of the individual defendants was entered. Summerland filed its answer, admitting the allegations of the complaint and prayed that it be appointed successor trustee of the Temple Site to carry out the above mentioned charitable purposes.

Naomi M. Morgan (Naomi), a stepdaughter of Williams and other stepchildren of Williams and members of their family filed a complaint and two amended complaints in intervention, alleging the Williams Trust to be invalid, and, among other things, that interveners (respondents) are heirs-at-law of the parties entitled to take the Temple Site under the decree of distribution of Williams' estate, that circumstances in Summerland have changed and that no public use could then be made of the Temple Site which would be "commensurate" with the intent of Williams as expressed in the Williams Trust, and that they were then in actual possession of the Temple Site and had been by themselves and their predecessors in actual, exclusive and adverse possession thereof continuously for five years prior to the filing of plaintiff's complaint and had paid all taxes assessed against that property during the five-year period.

The issues presented in opposition to the complaint by the other pleadings and during the trial were that respondents had acquired title to the Temple Site by prescription; the trust was invalid; Summerland had, in allowing a great lapse of time since it had knowledge of respondents' prescriptive possession, waived its rights and allowed its claim to become stale; that the original purpose of the trust had failed and that the doctrine of *cy pres* is not applicable.

The court concluded that the trust was valid, but that the purpose thereof had failed and that the doctrine of *cy pres* did not apply.

The court also found: "... that by the long delay and lapse of time plaintiff and defendants and their predecessors have acquiesced in the possession and claims of said intervenors. ..." There is no evidence that the Attorney General

knew respondents were making or intended to make a claim of adverse possession.

Further, it has been held that even the lapse of many years is no bar to an action by the Attorney General.

In *Brown* v. *Memorial National Home Foundation*, 162 Cal.App.2d 513, the court said at page 534 [329 P.2d 118, 75 A.L.R.2d 427]:

"... the proper administration of a benevolent trust, especially the prevention of departures from its legitimate objects and the redressing of breaches and repudiations of the trust, are matters of large public interest which preclude application of the doctrine of laches and estoppel and particularly so in an action brought by the attorney general. 'No length of diversion from the plain provisions of a charitable trust will prevent restoration to its true purpose.' (*William Buchanan Foundation* v. *Shepperd* (Tex.Civ. App.) 283 S.W.2d 325, 336.) 'The lapse of many years is no bar to such action. "Generally it is true that no length of time of diversion from the plain provisions of a charitable foundation will prevent its restoration to its true purpose."' (*Shattuck* v. *Wood Memorial Home, supra,* 319 Mass. 444 [66 N.E.2d 568, 573].) To the same effect, see *Trustees of Andover T. Seminary* v. *Visitors of Theological Inst.,* 253 Mass. 256. [148 N.E. 900, 918]."

 We are of the opinion laches does not apply to any facts that can be found from the evidence disclosed by the record in this case.

 It is clear and undisputed from the testimony that Williams started the town of Summerland as a spiritualistic colony. It is also clear from the trust that the purpose thereof as expressed therein was to provide the Temple Site for a spiritualist temple in Summerland, California, and to benefit spiritualism in that city. Naomi testified that she has resided in Summerland, California "off and on" from 1901, 1902, or 1903, and that she didn't think that there had been any spiritualist there for "a good many years." The president of the board of directors testified that Summerland had been active in Summerland, California but that it had moved to Santa Barbara in 1948 or 1949, because a majority of its members then were in Santa Barbara and that it conducted services every Sunday with a regular minister. A member of Summerland testified that it had a creed or doctrine in which they believe, that at the time of its move to Santa Barbara, there were only about four or five of its members left in Summerland, California, and that there no longer is an organ-

ized society of spiritualists in that city. It thus would appear that although the specific purpose of the Williams Trust, as expressed therein, of benefiting spiritualism in Summerland, California, cannot be accomplished, that Williams had a general charitable intent, to wit: the promotion of spiritualism, and that the case at bar is one in which the doctrine of *cy pres* can and should be applied.

The court found as a fact that respondents had acquired title by adverse possession in that interveners were in the actual exclusive and adverse possession of the Temple Site for more than five years, particularly the period from 1939-1945.

It is settled that property held for a public use cannot be acquired by adverse possession. (*County of Yolo* v. *Barney,* 79 Cal. 375 [21 P. 833, 12 Am.St.Rep. 152] ; *Board of Education* v. *Martin,* 92 Cal. 209 [28 P. 799].) It seems to us that property held under a charitable trust would have the same immunity. That property conveyed to a trust for charitable use is for a public use seems to be implicit in the law which charges the Attorney General with the duty and responsibility of enforcing the terms and supervising the management of all such trusts. (*Brown* v. *Memorial National Home Foundation, supra,* 162 Cal.App.2d 513, 535-537.)

However, the finding of adverse possession is not supported by the evidence.

All parties agree that the law on the subject of prescription, is succinctly set forth in the case of *Dimmick* v. *Dimmick,* 58 Cal.2d 417, 421-422 [24 Cal.Rptr. 856, 374 P.2d 824] as follows: ''In an action to quiet title based on adverse possession the burden is upon the claimant to prove every necessary element: (1) Possession must be by actual occupation under such circumstances as to constitute reasonable notice to the owner. (2) It must be hostile to the owner's title. (3) The holder must claim the property as his own, under either color of title or claim of right. (4) Possession must be continuous and uninterrupted for five years. (5) The holder must pay all the taxes levied and assessed upon the property during the period. (*Laubisch* v. *Roberdo,* 43 Cal.2d 702, 706 [1] [277 P.2d 9] ; *West* v. *Evans,* 29 Cal.2d 414, 417 [1] [175 P.2d 219].)'' (*Clark* v. *Stotts,* 127 Cal.App.2d 589, 592 [274 P.2d 172].)

It is settled that the presumption of ownership is with the paper title and clear evidence must be produced to

overcome that presumption. (*Wareham* v. *Randolph,* 184 Cal. App.2d 218, 225 [7 Cal.Rptr. 483].)

█ It is settled too that the burden of proving all of the essential elements of adverse possession rests upon the person relying thereon and it cannot be made out by inference but only by clear and positive proof. (*Clark* v. *Stotts, supra;* *Hahn* v. *Curtis,* 73 Cal.App.2d 382, 389 [166 P.2d 611].)

█ Respondents predicate adverse possession upon the following facts:

In 1944 Mr. Ray F. Lambert made arrangements for the use of the "Temple Site" when he leased the property in the city of Summerland, known as "The Becker estate." The Becker estate comprised property which was all around the "Temple Site." Mr. Lambert farmed the property but he was uncertain as to whether he last used it in 1947 or 1948. Lambert made his lease with Mr. Worsley Morgan, the stepson of H. L. Williams. It was a written lease, (nothing is said as to its duration) and provided that Lambert was to pay one-fourth of the crops to the Morgan-Becker Estate as rental for the use of the land. Before the crops were harvested, however, Lambert and Morgan agreed that Lambert would pay $750 per year and Lambert did pay that amount by check to Worsley Morgan in the year 1944. After 1944 Mr. Ray F. Lambert leased the same property from Naomi. He testified he leased it from her in 1945 and 1946 but didn't remember whether he leased it in 1947.

Mr. Frank Miller, farmed the subject property in 1943, the year immediately preceding the first year that Lambert farmed it. Miller leased the property from Worsley Morgan.

Mr. Ray F. Lambert testified that ". . . a Japanese fellow by the name of Joe [spelled Dyo], or something like that . . ." worked the land immediately prior to Miller, to wit: immediately prior to 1943. Mr. Lambert did not know how long Dyo worked the land but it was for more than a year and that Dyo used it continuously during the time he had it."

Mr. John F. Lambert testified that in January 1942 the Dyo family was farming the subject property. He did not recall when Dyo first farmed the subject property, but he did recall that Dyo farmed it in 1941 and was farming it in January of 1942 when he, John F. Lambert, left for the service.

Mrs. Lucille Morgan testified that she overheard a conversation between her husband, Worsley Morgan, and Dyo regarding a lease of the property in which Dyo asked her husband for permission to farm the vacant land, and he was

given permission to farm it by Worsley Morgan. Mrs. Lucille Morgan however did not recall the terms under which Dyo entered this property. She placed the time of the conversation between her husband and Dyo as "probably three or four years" before the beginning of the Second World War.

There is also evidence that prior to the time Dyo farmed the subject property, it was farmed by Mr. Tom Mayfield, but it appears that the property was vacant for a few years between the time that Mayfield farmed it and Dyo farmed it.

It also clearly appears from the record and the court took judicial notice of the fact that Dyo did not farm the subject property in 1942 and that he went to a camp pursuant to Civilian Exclusion Order No. 13 from Headquarters of the Western Defense Command and Fourth Army, Presidio of San Francisco, California, dated April 23, 1942. The court also took judicial notice of Civilian Exclusion Order No. 14 excluding "... all persons of Japanese ancestry, both alien and non-alien, be excluded from ... Counties of ... Santa Barbara . . ." and certain Executive orders which permitted the Secretary of War and the Military Commanders "... to prescribe military areas from which persons may be excluded."

There is no evidence that Dyo, a Japanese, violated the orders referred to which were applicable to the area of Santa Barbara where the property is located and it must be assumed that he complied therewith.

Insofar as payment of taxes is concerned, the record shows that the subject property was placed on the assessment roll and assessed by the Tax collector to the estate of H. L. Williams. The record further shows that the taxes of the subject property were paid by Naomi Morgan from an account of the estate of Agnes S. Becker.

There is a real question too as to whether the holding of Naomi Morgan can be tacked to the holding of her brother Worsley Morgan.

We have been cited to no case which impels a conclusion or finding that the mere fact that Worsley Morgan and Naomi Morgan were brother and sister, and that Naomi Morgan paid taxes on the property out of an account from the Agnes Becker estate establishes that privity of estate between Worsley and Naomi existed which is required to establish tacking. (Code Civ. Proc., § 326; *St. James Church* v. *Superior Court*, 135 Cal.App.2d 352, 362 [287 P.2d 387]; *Sorensen* v. *Costa*, 32 Cal.2d 453, 461-462 [196 P.2d 900].)

Even if tacking be assumed, the facts reflected by the record as outlined do not show a continuous five-year possession as required by law.

A review of the evidence relative to adverse possession shows that the respondents have not met the high standard of proof imposed upon them, that is, they have not proven adverse possession by the required "clear and positive proof."

The judgment is reversed and the trial court is directed to enter judgment in favor of defendant Summerland Spiritualist Association, a nonprofit corporation; wherein, among other things, Summerland Spiritualist Association will be appointed trustee of the property described in the Williams Trust and said property will be transferred to Summerland Spiritualist Association as trustee, to be held by said trustee for the purposes described in the Trust.

Kincaid, J. pro tem.,* concurred.

HERNDON, Acting P. J., Concurring and Dissenting. —I concur in the judgment only in so far as it reverses the judgment of the trial court. I dissent from the direction that judgment be entered in favor of appellants.

---

*Retired judge of the superior court sitting pro tempore under assignment by the Chairman of the Judicial Council.