PEDRO SÁNCHEZ GONZÁLEZ, recurrente, *v.* REGISTRADOR DE LA PROPIEDAD DE BARRANQUITAS, recurrido.

*Número:* O-77-202      *Resuelto:* 11 de octubre de 1977

362

364

*Roberto Holvino*, abogado del recurrente; el Registrador recurrido compareció por escrito.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

·El caso de autos suscita cuestiones de sumo interés respecto al concepto de fiducia testamentaria y otros aspectos de nuestro sistema jurídico. Esta es la segunda ocasión en que este Tribunal resuelve un litigio que gira alrededor del testamento del ilustre puertorriqueño don Federico Degetau.

## 1. *Los Hechos*

Don Federico Degetau otorgó testamento el 4 de octubre de 1913. Falleció el 20 de enero de 1914, sin tener descendientes ni ascendientes. Dispuso en el testamento dos legados. La cláusula sétima del mismo, copiada a continuación, regía la distribución de los bienes restantes:

"Que no teniendo herederos forzosos por ascendencia ni ·descendencia, de su libre y por espontánea voluntad, instituye como tales de todos sus restantes bienes, derechos y acciones, a su referida esposa doña Ana Moreno Vilariño y a don Bonifacio Sánchez y Giménez, en la siguiente forma: Sus bienes se dividan de por mitad entre ambos herederos: El usufructo de todos los inmuebles corresponderá de por mitad a ambos. A la muerte de cualquiera de los dos herederos, se destinará por el sobreviviente la parte del usufructo del que haya fallecido, a la creación, sos-

tenimiento o fomento de una institución de cultura o beneficencia en esta Isla de Puerto Rico, como una Biblioteca, Museo, Asilo de niños escrofulosos y raquíticos; creación de una cátedra en el Ateneo de San Juan, o, a cualquier otro objeto u objetos de naturaleza semejante que el sobreviviente decidiera. La otra mitad del usufructo de dichos bienes inmuebles, a la muerte del otro heredero tendrá igual o semejante destino.

Para el cumplimiento del propósito de crear la institución a que se refiere esta cláusula séptima, asigna el testador especialmente su colección de pinturas y libros formada con este objeto y los terrenos destinados al mismo en Aibonito y encarga y solicita de sus amigos Don Francisco Parra Capó y Don José Tous Soto, de Ponce, Don Manuel Fernández Juncos, Don Antonio Alvarez Nava, Don Emilio del Toro, y Don Luis Sánchez Morales, de San Juan, y de los señores James L. Slayden, Henry Allen Cooper, George Cabot Ward, George J. Moore y William A. Wilbur, que presten su cooperación a la realización de este propósito al ser solicitados para ello por sus citados herederos . . . ."

Doña Ana Moreno Vilariño murió en 1918 y el 17 de setiembre de 1923 se otorgó el correspondiente cuaderno particional. En la escritura de protocolización comparecieron don Bonifacio Sánchez y don Manuel Fernández Juncos, como apoderado este último de don Fernando Pignet, hijo único y universal heredero de doña Ana. En la escritura se consignó, entre otras disposiciones, la siguiente:

"NOVENA: RENUNCIA DE LA NUDA PROPIEDAD DEL SEÑOR PIGNET—Don Manuel Fernández Juncos con el carácter que ostenta de apoderado de Don Fernando María Pignet y Moreno, renuncia expresamente a favor de Don Bonifacio Sánchez y Giménez el derecho de nuda propiedad que según la interpretación dada al testamento de don Federico Degetau, habría de corresponder a su señora madre, Doña Ana Moreno, y que por fallecimiento de ésta vendría a recaer en el renunciante, como su único heredero.

Tal renuncia se hace con el solo fin y propósito de que el expresado Don Bonifacio Sánchez y Giménez adquiera en pleno dominio los bienes que solo en usufructo parece haberle dejado el causante, Don Federico Degetau; pero constituye la causa e

intención de tal renuncia que los bienes que en virtud de la misma adquiriera el señor Sánchez, como procedentes del señor Pignet, queden en él y se le adjudiquen *in trust* para cumplir la voluntad y obligaciones impuestas por el causante, Don Federico Degetau . . . .

DECIMA: RENUNCIA DE LA NUDA PROPIEDAD DEL SEÑOR SANCHEZ—El compareciente, don Bonifacio Sánchez y Giménez, hace igual renuncia y a los fines antes indicados de la parte de la nuda propiedad que pueda corresponderle por virtud del fallecimiento de la citada doña Ana Moreno, esposa del señor Degetau.

. . . . . . . .

DECIMA-CUARTA: HABER DEL CAUSANTE DON FEDERICO DEGETAU—De todo lo anteriormente expuesto resulta que el haber que por todos conceptos correspondía al causante, Don Federico Degetau, pasa a ser de don Bonifacio Sánchez y Giménez en concepto de heredero voluntario de aquél y en la siguiente forma: una mitad en usufructo, y la otra mitad del usufructo y toda la nuda propiedad del expresado haber de dicho causante, *constituye un fideicomiso o 'trust' y así se adjudicará al expresado señor Sánchez Giménez, para cumplir el pensamiento humanitario del testador señor Degetau, según reza su testamento."* (Bastardillas nuestras.)

En virtud de la partición acordada, ciertos inmuebles fueron inscritos a nombre de don Bonifacio Sánchez, entre ellos la finca Rosa Cruz en Aibonito, parte de la cual está envuelta en este pleito. La inscripción en el Registro de la Propiedad reza así:

"El adjudicatario, señor Sánchez y Giménez, tendrá el usufructo de esta finca, en cuanto a la mitad de la misma, es decir: que podrá disponer libremente, para sí, de la mitad de sus productos y rentas y de su aprovechamiento; pero en cuanto al resto de dichos productos y rentas y toda la nuda propiedad, será considerado como 'Trustee', y deberá dar a los mismos el destino a que se refiere el testamento."

Don Bonifacio falleció el 17 de abril de 1944. En su testamento, otorgado cinco días antes de su muerte, hizo diversos legados a entidades de fines no pecuniarios. Respecto a la

finca Rosa Cruz dispuso la segregación de veinte cuerdas para la American Baptist Home Mission Society, ordenando que el remanente "pase a ser propiedad del sobrino del testador, don PEDRO SANCHEZ GONZALEZ ... como recompensa por su cariño y paciencia en ayudarme y cuidarme con el esmero con que lo ha venido haciendo durante tantos años, y como caridad para que él pueda ayudar a su madre paralítica, residente en España . . . ." Del legado a don Pedro, don Bonifacio expresó que debía entregarse a la Iglesia Apostólica Romana una parcela de tres cuerdas.

Las escrituras sobre el pago de legados a don Pedro Sánchez González y a la Iglesia Católica fueron presentadas al Registro de la Propiedad en Guayama. El Registrador denegó la inscripción por el fundamento de que "si bien la finca principal de donde se segrega la parcela adjudicada consta inscrita a favor del testador Bonifacio Sánchez Giménez, ésta lo está como heredero y fideicomisario [*sic*] de su causante don Federico Degetau González 'in trust' para darle el destino dispuesto . . . en la cláusula séptima de su testamento . . . y no puede el heredero así instituído . . . disponer de los bienes dejádosle, para beneficio y lucro de personas o instituciones ajenas a las nombradas por el testador don Federico Degetau González en su citado testamento."

Tanto la Iglesia Católica como don Pedro Sánchez González instaron el correspondiente recurso gubernativo. Este Tribunal confirmó el 31 de enero de 1946 la nota denegatoria del Registrador en *Iglesia Católica* v. *Registrador*, 65 D.P.R. 604 (1946). Resolvimos entonces que el testador, don Bonifacio Sánchez, en su calidad de fiduciario, no podía desatender la obligación que le impuso don Federico Degetau en la cláusula sétima de su testamento respecto al destino de sus bienes.

Don Pedro Sánchez González decidió de todos modos continuar en posesión de la finca y el 2 de junio de 1975 inició un procedimiento de expediente de dominio para que se re-

conociera su título. Por resolución de 31 de octubre de 1975 el Tribunal Superior, Sala de Aibonito, ordenó la inscripción de la finca en el Registro de la Propiedad. El Registrador de Barranquitas la rechazó por tres fundamentos: porque no procedía iniciar un expediente de dominio cuando la finca de que se trata consta inscrita en el Registro; porque el bien concernido no podía dedicarse para el beneficio de personas o instituciones ajenas a las nombradas por don Federico Degetau; y porque la prescripción extraordinaria no podía invocarse, ya que se había comenzado a poseer a tal fin sólo a partir de la sentencia en *Iglesia Católica*.

Don Pedro Sánchez González, también litigante en *Iglesia Católica*, es quien insta este recurso. Su contención básica es que esta vez tiene derecho a la inscripción del pleno dominio por haberlo adquirido mediante usucapión.

## 2. Las Cuestiones Centrales

Este caso plantea diversas interrogantes: ¿Representa el expediente de dominio seguido en este caso el procedimiento indicado para cancelar un asiento registral contradictorio? ¿A qué figura jurídica corresponde el testamento de don Federico Degetau? ¿Cuál es la relación entre tal figura y la usucapión? ¿Son prescriptibles los bienes objeto de este litigio? De serlo, ¿quién puede invocar la prescripción adquisitiva? De poder reclamarla un litigante en las condiciones del recurrente, ¿se cumplieron los requisitos que el Código Civil impone para ampararse en ella? Por último, ¿dónde reside el poder de velar por el fiel cumplimiento de legados para fines benéficos y caritativos de orden análogo a los contenidos en el testamento de don Federico Degetau? Veremos que la contestación a algunas preguntas hace innecesario que nos pronunciemos definitivamente en cuanto a otras.

## 3. La Improcedencia de la Información de Dominio

Es doctrina sentada en Puerto Rico que no procede inscribir la resolución aprobatoria de una información de

dominio cuando existe un asiento contradictorio cuyo titular, si bien ha sido citado, no ha consentido a la cancelación ni ha sido vencido en juicio. *Rodríguez* v. *Registrador*, 65 D.P.R. 653, 655–656 (1946); *Mercado* v. *Registrador*, 68 D.P.R. 138 (1948); *Bermúdez* v. *Registrador*, 74 D.P.R. 151 (1952). Véanse: los Arts. 20, 82, 393 y 395 de nuestra Ley Hipotecaria, 30 L.P.R.A. secs. 45, 156, 735 y 737; Morell y Terry, *Comentarios a la Ley Hipotecaria*, 2ª ed., Tomo 5, Madrid, 1934, págs. 573–578; Roca Sastre, *Derecho Hipotecario*, 6ª ed., Tomo III, Barcelona, 1968, pág. 319 *et seq.* El expediente de dominio es inaplicable cuando se trata de obtener la extinción de asientos definitivos sin la garantía del juicio contencioso. Morell y Terry, *op. cit.*, 576; Resolución de 26 de marzo de 1923 de la Dirección General; Roca Sastre y Molina Pujol, *Jurisprudencia Registral*, Tomo V, pág. 805. En *Benítez* v. *Registrador*, 71 D.P.R. 563, 568 (1950), expresamos:

"Mientras no se suscite contienda entre partes conocidas y determinadas, no pierde el expediente su carácter de procedimiento *ex parte*—ni la resolución, por lo tanto, adquiere la autoridad de cosa juzgada, *González* v. *El Pueblo*, 10 D.P.R. 483. Cuando existe asiento contradictorio en el Registro y comparece el titular del asiento a oponerse al expediente y a la cancelación del mismo es que entonces el procedimiento *ex parte* adquiere el carácter de contencioso y sólo entonces es que, oído y vencido en juicio el titular, puede ordenarse la cancelación del asiento si se declara justificado el dominio a favor del promovente."

La información de dominio no es el procedimiento más adecuado para controvertir el título de beneficiarios innominados, excepto de modo genérico, en fideicomisos y otras instituciones aquí discutidas. La notificación rutinaria al fiscal y su acostumbrada comparecencia por escrito no están particularmente diseñadas para proteger los intereses de estos beneficiarios. Para el logro del debido respeto a la voluntad de testadores que encomienden bienes a fiduciarios para propósitos caritativos es imprescindible, aplicando la

norma de *Benítez*, que se venza en juicio contencioso al titular del asiento, así como a los beneficiarios de la liberalidad o sus representantes. La ausencia de oposición formulada por el fiscal en el expediente de dominio que nos ocupa no le restó al mismo su carácter de procedimiento *ex parte*. Nunca llegó a alcanzar éste categoría de juicio. Roca Sastre, *Derecho Hipotecario*, Tomo I, 6ª ed., Barcelona, 1968, pág. 882.

Procede sin más, por la razón expuesta, la confirmación de la nota recurrida. Dada nuestra obligación, no obstante, de fomentar la conclusión de los litigios y aclarar en lo posible el derecho del país, resulta indispensable que nos expresemos sobre otro motivo que justifica la confirmación de la nota, aun asumiendo la procedencia del expediente de dominio. De otro modo se corre el riesgo de que continúe frustrándose por años la voluntad testamentaria de don Federico Degetau y de que el fideicomiso de fines no pecuniarios e instituciones análogas sufran daño irreparable al relegarse a similar limbo jurídico.

A los efectos de considerar en forma debida este segundo fundamento para la denegación del recurso presente importa examinar algunas cuestiones preliminares.

4. *La Figura Jurídica Creada por el Testamento de Degetau*

■ Don Federico otorgó testamento, como hemos señalado, en 1913 y falleció un año más tarde. Nuestra ley de fideicomisos data de 1928, Ley Núm. 41 de 23 de abril, 31 L.P.R.A. sec. 2541 *et seq.* El llamado fideicomiso de fines no pecuniarios se incorporó a nuestra legislación en virtud de la Ley Núm. 211 de 8 de mayo de 1952. Para identificar la figura jurídica que el testamento de Degetau intentó establecer cabe acudir únicamente al Código Civil, que al menos hasta entonces no mostraba indicio alguno de recepción del *trust* norteamericano en la materia que nos ocupa.

Nuestro Código Civil proveía para aquellos años diversas instituciones jurídicas a través de las cuales podía concebiblemente realizarse la voluntad testamentaria de Degetau:

la fundación, (¹) la disposición modal o con carga, (²) la sustitución fideicomisaria, (³) el fideicomiso de herencia y el perpetuo. (⁴) La selección de la figura o combinación de figuras aplicables a este caso no está exenta de dificultades. (⁵)

El empleo de la fundación en particular está muy generalizado en países donde impera el derecho civil para lograr fines análogos a los realizables por el *charitable trust* (⁶) del derecho común y a los consignados por Degetau en su testamento. Albaladejo, *Derecho Civil*, vol. I, 3ª ed., Barcelona, 1973, pág. 371 *et seq.;* Canet, *Le Régime des Fondations en France,* (⁷) 1952; Fondazione Agnelli, ed., *The Fiscal and Juridical Status of Foundations*, Torino, 1972; Neuhoff, I. y Pavel, U., ed., *Trust and Foundations in Europe*, London, 1971; De Wulf, C., *The Trust and Corresponding Institutions*

---

(¹) Véanse los Arts. 27, 28, 29 y 31 del Código Civil de 1902, sorprendentemente enmendados por la Ley Núm. 48 de 28 de abril de 1930 para eliminar las fundaciones de nuestro derecho a pesar de que la Ley de Fideicomisos de 1928 no proveía para fideicomisos de fines benéficos, error que se trata de curar de otro modo en la Ley Núm. 211 de 8 de mayo de 1952.

(²) Véanse: Puig Brutau, *Fundamentos de Derecho Civil*, Tomo V, vol. II, 2ª ed., Barcelona, 1977, pág. 459 *et seq.;* Castán Tobeñas, *El modo en los actos jurídicos*, Rev. Der. Privado, Tomo 8, 1921, pág. 212 *et seq.;* Manresa, *Comentarios al Código Civil Español*, Tomo VI, vol. I, Madrid, 1973, pág. 391; y, entre otros, el Art. 726 del Código Civil, 31 L.P.R.A. sec. 2338.

(³) Art. 703 y ss. del Código Civil, 31 L.P.R.A. sec. 2301 *et seq.;* Puig Brutau, *op. cit.*, 523 *et seq.;* Espín Cánovas, *Manual de Derecho Civil Español*, vol. V, 3ª ed., Madrid, 1974, págs. 313–314.

(⁴) Puig Brutau, *op. cit.*, 531.

(⁵) Véase: Sánchez Vilella, Luis F., *El Fideicomiso Puertorriqueño V: las Vicisitudes del Fideicomiso de don Federico Degetau*, 38 Rev. C. Abo. P.R. 159 (1977).

(⁶) Esta frase no es traducible *strictu sensu,* ya que la institución del *trust* difiere marcadamente de la del fideicomiso civilista. Puig Brutau, *op. cit.*, 526–530.

(⁷) Es interesante anotar que el derecho francés reconoce la fundación, a pesar de que, distinto a España y otros países, la institución no tiene allí base estatutaria alguna. Su recepción ocurrió a través de la jurisprudencia. 3 *Encyclopédie Dalloz*, 2ª ed. 1977, "Fondation", pár. 3.

*in the Civil Law,* Brussels, 1965. No es imprescindible, sin embargo, para propósitos de este recurso, calificar definitivamente la figura o figuras jurídicas que encierra el testamento de don Federico Degetau. Todas las aquí mencionadas están comprendidas en el concepto de fiducia testamentaria.[8] Basta con señalar que el testamento de Degetau le impuso a don Bonifacio Sánchez una obligación fiduciaria respecto a los bienes del caudal relicto cuya nuda propiedad pasó a sus manos. Don Bonifacio Sánchez nunca poseyó bien alguno de don Federico Degetau a título de dueño del pleno dominio. Don Bonifacio Sánchez no podía traspasarle a persona o entidad alguna lo que nunca tuvo. Ese es el significado central de nuestra decisión en *Iglesia Católica* v. *Registrador,* 65 D.P.R. 604 (1946).

La Ley Núm. 211 de 8 de mayo de 1952,[9] de aplicarse al caso presente, refuerza nuestra conclusión en *Iglesia Católica.* Tal ley creó el "fideicomiso con fines no pecuniarios" y a la vez convalidó todo fideicomiso de esa índole creado con anterioridad a la vigencia del estatuto. "El fideicomiso con fines no pecuniarios", expresa la ley, 31 L.P.R.A. sec. 2541, "es una relación fiduciaria respecto a bienes, que surge como resultado de la declaración del propósito de crearlo, e impone a la persona en posesión de los bienes deberes en equidad de explotar los mismos para un fin no pecuniario." Esta definición es una traducción literal de la utilizada en el *Restatement of the Law, Trusts, Second,* sec. 348, para describir el *charitable trust.* Aun de estimarse que la voluntad testamentaria de don Federico Degetau no es realizable por institución civilista alguna y que la única figura jurídica aplicable es la del *charitable trust,* llegamos, por tanto, a conclusiones idénticas a las expuestas. La posesión de don Bonifacio Sánchez a partir de 1923 fue en calidad de

---

[8] Puig Brutau, *op. cit.,* 531.

[9] Véase la nota (1), *supra.*

fiduciario de la totalidad de los bienes de don Federico Degetau y usufructuario de parte. Nunca disfrutó de ellos a título de dueño.

Queda por ver, no obstante, si las conclusiones consignadas impiden que don Pedro Sánchez haya adquirido por usucapión el inmueble que le fue legado.

## 5. *El Problema de la Prescripción Adquisitiva*

Don Pedro Sánchez alega que advino titular dominical del inmueble por prescripción extraordinaria. Esta contención suscita tres interrogantes. ¿Son prescriptibles los bienes envueltos? ¿Quién puede usucapir? ¿Se cumplen en este caso los requisitos que el Código Civil impone para que opere la prescripción extraordinaria? Exploremos estos temas.

a) *La prescriptibilidad o no de bienes dedicados a fines benéficos*

En derecho común norteamericano el *corpus* de un *charitable trust* no puede ser objeto de prescripción de tipo alguno. 4 Scott, *On Trusts*, 3ª ed. 1967, sec. 327.2; *Mosk* v. *Summerland Spiritualist Association*, 37 Cal. Rptr. 366 (1964); *Hicks* v. *City of Providence*, 113 Atl. 791 (R.I. 1921); *Brown* v. *Memorial National Home Foundation*, 329 P.2d 118 (Cal. 1958); *Davenport* v. *Attorney General*, 280 N.E.2d 193 (Mass. 1972); *Mount Vernon Mortgage Corp.* v. *United States*, 236 F.2d 724 (D.C. Cir. 1956).

Existe diferencia de criterios sobre este tema entre países de tradición civilista. Francia se inclina a favorecer la imprescriptibilidad. Popesco, T. R., *L'Adaptation des Fondations aux Nouvelles Circonstances en Droit Comparé*, París, 1940, pág. 60 *et seq.;* 3 *Encyclopédie Dalloz*, 2ª ed. 1977, "Fondation", párs. 15–16, 27. En Alemania la violación de la relación fiduciaria da lugar meramente, por regla general, a una acción de daños. Immenga, M. F., "Outlines of the Juridical and Fiscal Status of Foundations in Germany", en Fondazione Agnelli, *The Fiscal and Juridical Status of Foun-*

*dations*, Torino, 1972, págs. 58–59. En España la situación es confusa. Alas, De Buen y Ramos, *De la Usucapión*, Madrid, 1916, págs. 114–140.

De resolverse que nuestra legislación creadora del fideicomiso de fines no pecuniarios en 1952 tuvo el efecto de adoptar la totalidad del régimen jurídico que gobierna el *charitable trust* norteamericano aquí terminaría el caso presente. La cuestión es debatible. El historial de la Ley Núm. 211 de 8 de mayo de 1952 no es del todo claro. De un lado se define el fideicomiso de fines no pecuniarios, como hemos visto, en forma análoga al *charitable trust*, pero del otro la Asamblea Legislativa eliminó del anteproyecto de ley una expresión específica al efecto de que la institución del fideicomiso de fines no pecuniarios sería "equivalente al término *charitable trust* de la ley común norteamericana." (10) Debe también recordarse que la recepción por vía de la jurisprudencia de la doctrina angloamericana de los fideicomisos implícitos no ha impedido que este Tribunal, contrario a la regla del derecho común, les imponga plazo de prescripción a las acciones para exigir su cumplimiento. *Rossy* v. *Tribunal Superior*, 80 D.P.R. 729, 751–752 (1958). La Ley Núm. 211, además, no es de evidente aplicación al caso ante nos. ¿Necesitaba convalidación retroactiva un testamento como el de don Federico Degetau, perfectamente otorgable, en 1913 al menos, bajo instituciones reconocidas del derecho civil?

Dada la existencia dentro del marco del derecho civil de un fundamento(11) para decidir que no puede invocarse en este caso la prescripción extraordinaria, consideramos innecesario expresarnos en esta ocasión sobre el problema de la

---

(10) Véase el cambio que sufre el P. del S. 12 de 13 de febrero de 1952. En la versión impresa del proyecto según aprobada finalmente por ambas cámaras consta, por tachadura, el cambio ocurrido. Archivos de la Secretaría del Senado. Consúltense también las Actas de la Cámara de 1952, págs. 1174–1175.

(11) Véase el apartado (c) de esta sección, *infra*.

prescriptibilidad o imprescriptibilidad de bienes sujetos a un fideicomiso de fines no pecuniarios o a otro género de relación fiduciaria encaminada a su dedicación a fines benéficos.

b) *Quién puede usucapir*

Está firmemente establecido en el derecho civil que el usufructuario de bienes inmuebles no puede usucapir. Borrell y Soler, *Derecho Civil Español*, Tomo II, 1955, Barcelona, pág. 265. Tampoco el que posee en concepto de fiduciario. Manresa, *Comentarios al Código Civil Español*, Tomo 12, 6ª ed. rev., 1973, Madrid, pág. 1076; Sentencia de 10 de noviembre de 1958, Aranzadi, *Repertorio de Jurisprudencia*, Tomo XXV, vol. II, pág. 4190. Tampoco el colono, el comodatario, el apoderado "y, en general, todos los que poseen en nombre o en representación de otro no pueden adquirir el dominio de lo poseído por ellos, ni ningún otro derecho, por virtud de prescripción, no ya ordinaria, sino ni aun por la extraordinaria." *Dávila v. Córdova*, 77 D.P.R. 136, 141 (1954). Al precarista también le está vedada la condición de usucapiente. Weill, *Droit Civil, Les Biens*, 2ª ed. Dalloz, 1974, pág. 380, nota 1. Don Bonifacio Sánchez nunca poseyó a título de dueño, sino sólo en calidad de usufructuario y fiduciario. Examinemos ahora la naturaleza de la posesión de don Pedro Sánchez.

c) *Incumplimiento del requisito de posesión en concepto de dueño*

Para que pueda invocarse con éxito la prescripción extraordinaria tiene que poseerse la propiedad en concepto de dueño y en modo ininterrumpido, público y pacífico. Art. 1841 del Código Civil, 31 L.P.R.A. sec. 5262; *Dávila v. Córdova*, supra, 150–151. Don Pedro Sánchez nunca poseyó a título de dueño. Heredó sujeto a una obligación fiduciaria, según se desprende de nuestra decisión en *Iglesia Católica*. Véase: Alas, De Buen y Ramos, *De la Usucapión*, Madrid, 1916, págs. 220–221. Allí advertimos al propio promovente de este recurso que, por tratarse de bienes fideicomitidos, no

adquirió a título de dueño. Ahora bien, ¿logró don Pedro Sánchez, quien si no era fiduciario era simple precarista, llegar a poseer la finca Rosa Cruz en concepto de dueño?

En Puerto Rico rige la doctrina civilista de inversión o interversión de título. *Vélez Cordero* v. *Medina*, 99 D.P.R. 113, 120 (1970). La inversión de título no se presume. Art. 365 del Código Civil, 31 L.P.R.A. sec. 1426; Velázquez, G., *Los Derechos Reales Principales*, mimeo., Río Piedras, 1937, pág. 289. El estado de precariedad no se transforma por la simple voluntad del detentador. Marty et Raynaud, *Droit Civil*, Tomo II, vol. 2, Sirey, París, 1965, pág. 34; Carbonnier, *Droit Civil, Les Biens*, vol. 3, París, 8ª ed., 1975, pág. 158 *et seq.*; De Martino, F., *Del Possesso*, 4ª ed., 1970, pág. 86 *et seq.* (parte de la obra general: Scialoja e Branca, *Commentario del Codice Civile*).

No surge de autos prueba demostrativa de acto alguno o nuevo título que pudiese haber dado lugar a la aplicación de la referida doctrina conforme los criterios expuestos en *Vélez Cordero* v. *Medina*, supra. Don Pedro Sánchez no puede reclamar el título dominical del inmueble a base de la prescripción extraordinaria.

6. *Facultad del Registrador para Negarle Efecto Hipotecario a la Resolución Judicial Emitida en el Expediente de Dominio*

Repetidamente hemos expresado la regla general que un Registrador no puede intervenir con las determinaciones judiciales. *Ruiz-Sierra* v. *Registrador*, 103 D.P.R. 578 (1975); *Caballero* v. *Registrador*, 35 D.P.R. 617 (1926). Si esto es así, ¿podía el Registrador negarse a inscribir el título a favor de don Pedro cuando el Tribunal Superior le había ordenado hacerlo? Sí.

Están presentes aquí los elementos de una excepción reconocida a la regla general. Barrachina ha afirmado que "si bien no tienen facultad los Registradores para calificar los

fundamentos de las sentencias dictadas por los juzgados y tribunales, a los efectos de su inscripción, la tienen para examinar la naturaleza del mandato judicial y la del juicio en que hubiesen recaído, así como para examinar los libros del Registro y ver si pugnan con el derecho de tercero que no haya sido parte en el pleito, debiendo denegar aquella cuando exista algún obstáculo legal procedente de asiento no cancelado . . . ." Barrachina, *Derecho Hipotecario y Notarial*, Tomo I, 1910, pág. 201. Al mismo efecto, Roca Sastre, *Derecho Hipotecario*, Tomo II, 6ª ed., 1968, págs. 254–257; Sanz, *Derecho Hipotecario*, Tomo II, Madrid, 1953, págs. 159–160. En el caso presente, surge del Registro y de los documentos sometidos al Registrador que el inmueble cuya inscripción se ordenó es un bien fideicomitido; que los terceros fideicomisarios no han sido vencidos en pleito contencioso; que de hecho no ha habido juicio alguno, ya que se trata de un expediente; y que la resolución recaída está en pugna con la realidad registral. En tales circunstancias es permisible denegar la inscripción por las razones expuestas en la parte que antecede de esta opinión. Es innecesario en consecuencia discutir el tercer fundamento aducido por el Registrador.

7. *Futuro del Testamento de don Federico. Quién Vela por su Fiel Cumplimiento*

▄▄▄▄▄ De limitarnos a confirmar la nota denegatoria es enteramente posible que la última voluntad de don Federico Degetau quede incumplida o que su testamento prosiga *ad aeternam* su triste peregrinación por las cortes. Caben por tal motivo unas observaciones finales. Tanto en el derecho civil como en el común se le reconocen al Estado poderes de supervisión respecto a bienes dedicados a fines caritativos o benéficos vía la creación de fundaciones, fideicomisos, *charitable trusts* e instituciones análogas. Pomey, M., "Le Régime Juridique des Fondations Privées, Culturelles et Scientifiques en Droit Francais", en Fondazione Agnelli, ed., *The Fiscal and Juridical Status of Foundations*, Torino, 1972, pág. 4;

Conviser, R. J., *The Modern Philanthropic Foundation in America and Germany*, Cologne, 1964, págs. 81–82; 4 Scott, *On Trusts*, 3ª ed., 1967, sec. 391. En el Secretario de Justicia de Puerto Rico, como defensor del interés público de que están revestidas las instituciones de que hemos hablado, reside la facultad para requerir de los tribunales el nombramiento de un fiduciario para cumplir la voluntad testamentaria de don Federico Degetau. Para evitar que en casos futuros puedan debilitarse las instituciones disponibles para la dispensa de liberalidades con gravamen, nuestra Asamblea Legislativa puede considerar legislación encaminada a proteger el interés público en situaciones como la presente. Como ejemplo, véase: The Charities Act 1960, 3 Halsbury, *Statutes of England*, 3ª ed., pág. 589 *et seq.*

*Por las consideraciones expuestas se confirma la nota del Registrador recurrido.*

El Juez Asociado Señor Rigau no participó. Los Jueces Asociados Señores Martín y Negrón García concurren con la confirmación de la nota recurrida por ser improcedente la información de dominio.